**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA :**

v.                    :          **21-CR-474-01 (BAH)**

**KRISTI MUNN**                    **:**

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Ms. Munn comes before this Court for sentencing having pleaded guilty to one count of parading, demonstrating or picketing in the United States Capital on January 6, 2021. She was arrested 19, 2021, and has been on her personal recognizance since her arrest. She has been fully compliant with her release conditions and has been cooperative with law enforcement. She completed her interview with law enforcement and answered all of their questions.  She expressed an early desire to plead guilty and remains prepared to accept the consequences of her actions. She acknowledges the seriousness of her conduct and deeply regrets having gone to the U.S. Capital that day. However, as the Probation Office has noted in its recommendation, Ms. Munn's culpability is minimal in contrast with those who vandalized or stole government property or assaulted or threatened law enforcement. She requests that the Court adopt the recommendation of the Probation Office and impose a probationary sentence.

**Background and Characteristics of Ms. Kristi Munn**

Ms. Kristi Munn is 30 years old and has had no prior criminal charges or convictions. She does have prior traffic infractions. She was raised in a close-knit family, the eldest of 8 children. Her parents both worked during her childhood and were supportive of her and her siblings. As

she grew older, her mother became the primary financial support for the family. When one of her siblings was diagnosed with a serious illness, there was a shift in the family dynamic, and she left the family home in her late teens. She married, became pregnant, but later divorced her husband for reasons noted in the PSR at Paragraph 49.  She later became involved in an abusive relationship with the father of her third child. The abuse was significant enough to cause her to have to seek medical treatment and criminal charges. She also suffered with mental health issues, including Major Depressive Disorder and Post Traumatic Stress Disorder. (Please see the more expansive review of her mental health history in the PSR at Paragraphs 64 – 69). She has since left that abusive relationship and has legal custody of her three children, ages 6, 7, and 11. She continues to participate in mental health counseling, psychotherapy, and self-care seminars as needed. She recognizes that her children are suffering from the poor choices she made on January 6. Since January 6, Ms. Munn has married a retired US Air Force veteran who works as a certified nursing assistant. They have a wonderful relationship and he remains supportive of her. They live together in Texas with her 3 children in a modest home.

In addition to raising her children, Ms. Munn works.  She obtained her GED in 2010 and then obtained a Certificate of Completion in Vocational Nursing in 2019. She is seeking to obtain her bachelor's degree in nursing and has a consistent pattern of employment.  She is currently employed as nurse for a nurse travel agency.

**Circumstances of the Offense**

 In January 2021, Ms. Kristi Munn traveled to Washington D.C. with a number of family members in large part to attend the Trump rally, but also as a family vacation and graduation trip for younger siblings. They intended to visit historical monuments, Arlington National Cemetery and Bull Run in Virginia. They traveled to D.C. on January 5 from Texas.

On January 6, they traveled by subway from their hotel to the ellipse for the rally. They were not in the VIP area, but watched the rally and Trump's speech on the JumboTron. After attending the rally, they walked toward the Capitol with the crowds. They entered the grounds slightly northwest of the Capitol. Ms. Munn and her family members did enter the building through the window near the Senate Wing doors (not to be confused with the Senate Floor), and clearly knew that they were going somewhere they were not entitled to be. She does not dispute this. However, the decision to enter the building was not premeditated or even discussed between the family members – when they approached the building and observed others entering freely through an open window, they simply did the same.

While inside the building, Ms. Munn never engaged with law enforcement, nor did she damage or disrespect any property (in fact, she picked up trash while inside the building). Although they did witness others physically engaging with law enforcement, the Munn family did not participate in any way.  Ms. Munn had not been expecting to see violent conflict between protestors and law enforcement; nor had she been expecting to see the Capitol building in disarray. Upon observing both these things, Ms. Munn and her family made the decision to leave the building far before they actually exited.  As a group of five, the Munn family was mindful of sticking together to avoid becoming separated amongst the large crowd which made their exit more complicated than for those acting alone. Although Ms. Munn and her family were inside for approximately 51 minutes, more than half of that time was spent looking for a way out and/or avoiding chaotic and potentially dangerous situations.

<u>Actions within the Capitol building:</u>

At **2:26pm** (one minute after entering the building), Ms. Munn picked up a framed photograph of George Bush that was lying on the floor. She looked for a way to replace it on the wall.[1]



*CCTV camera 0102 at 2:26:32pm*

Ms. Munn and her family then walked with the crowd down the hallway and passed through the crypt. While in the crypt lobby at **2:33pm**, they picked up trash from the ground.

---

[1]*Earlier footage confirms that the framed photograph had been tossed onto the ground by another protestor at 2:23:52pm*

 

*CCTV camera 7206 at 2:33pm*

Ms. Munn and her family then walked down the stairs toward the visitor center where they witnessed other individuals physically engaging with law enforcement. Ms. Munn recalls that it was mostly the actions of one man acting violently. She acknowledges that she was close enough to witness this event, and even stood and watched portions of it. But she did not participate (neither physically nor verbally). Her role was an observer.

Although Ms. Munn had been questioning her decision to enter the building for some time, at **2:45pm**, she and her family made the firm decision to leave the building as soon as possible. They were the first of the large group to leave the area of the visitor center. They began retracing their steps with the intent of exiting the building the same way in which they had entered.

On their way back to the exit, Ms. Munn and her family encountered law enforcement, including MPD Officers Tara Tindall and Anthony Alioto, who directed them down a hallway which was not the route the family had originally taken. Audio and video from body worn cameras of both officers show that Ms. Munn complied with directions and did not speak back to law enforcement. Ms. Munn's younger sister said, "We need to find an exit"; and her younger brother politely thanked the officers. The respectful behavior of the Munn family is in contrast

to the majority of the protestors following shortly behind them who yelled at these officers and called them traitors.



*CCTV camera 7206 at 2:45:38pm; BWC of Officer Tindall at 2:45:39pm*

Unbeknownst to Ms. Munn, the Senate wing doors and windows had been secured by law enforcement shortly after they had entered. This was understandably causing confusion amongst the officers about where to direct the protestors who were already inside the building. At **2:46pm**, near the crypt, Ms. Munn was directed by a USCP officer to walk to her left. Moments later they were then ushered back in the opposite direction by a different officer.



*CCTV Camera 0701 at 2:45:58pm and 2:46:27pm*

After receiving conflicting instructions, the Munn family was able to make their way back to the exit where law enforcement was now facing the difficult task of attempting to let protestors out of the building while also keeping new protestors from entering. Ms. Munn and

her family approached the exit at **2:47pm**. Law enforcement pointed them toward the window, but seconds later a large wave of protestors poured into the building and clashed with police causing the Munn family to retreat back down the hallway.



*CCTV Camera 0102 at 2:47:20pm and 2:47:25pm*

At **2:48pm**, the family returned to the exit a second time, and again more conflict broke out between officers and other protestors. Again the family backed away.



*CCTV Camera 0102 at 2:48:44pm*

By **2:52pm**, the incoming mob had filled the entire area, pushing the Munn family further down the hall and preventing them from safely exiting the building as a group.



*CCTV Camera 0102 at 2:52:47pm*

At **3:09pm**, Ms. Munn and her family left the crowded lobby area and regrouped in the crypt until **3:13pm**. During this time, they stood together while Ms. Munn's father sat and rested on a bench.



*CCTV Camera 0402 at 3:12:20pm*

At **3:14pm**, the Munn family again approached the exit which was still densely crowded. They entered a nearby conference room where they could see out the window and remained here until **3:16pm**. During this time, Ms. Munn is seen in a public source video looking out the window at a line of law enforcement and hundreds of protestors; she can be heard saying, "How are we going to get out of here?"  While in this room, Ms. Munn also witnessed a man attempting to steal plates from a cabinet. She told him to put them back.



*Public Source video; CCTV roof camera 0908 at 3:15:11pm*

At **3:17pm**, Ms. Munn followed her father who led them out of the conference room and toward the exit. As he walked toward the door, two different officers instructed him to leave through the window instead. The Munn family complied and exited the capitol building.



*CCTV camera 0102 at 3:17:04pm*

Actions after exiting the Capitol building:

Upon exiting the building, Ms. Munn and her family left Capitol grounds immediately. They walked to the nearest subway station and were back at their hotel well before the curfew was announced.  In fact, Ms. Munn does not recall being aware that there was a curfew until she was told as much by her legal team. They never had any intentions of lingering on Capitol grounds.

Ms. Munn acknowledges that in the immediate aftermath, she shared information on Facebook about their trip, including posts which indicated that she was proud of their actions. She soon realized how wrong she was to feel that way as the gravity of her actions set in. Ms. Munn has been trying to deal with the enormity of her actions and the consequences since January 6th. Shortly after the incident, she deleted her social media accounts and she has been focusing on working and raising her children.

**A Sentence of Probation would be Appropriate in this Case**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United States*, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing. Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a). Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for

restitution; and (f) the need for the sentence to reflect the following: the seriousness of the

offense, promotion of respect for the law and just punishment for the offense, provision of

adequate deterrence, protection of the public from future crimes and providing the defendant

with needed educational and vocational training, medical care, or other correctional treatment.

*See* 18 U.S.C. §3553(a).  In this case, a term of probation would meet all of the pertinent

purposes of sentencing and would be appropriate given Ms. Kristi Munn's history and

characteristics.

 Notably, Ms. Munn did not engage in any violence or destruction of property.  The

government will likely suggest that that lack of violence and destruction of property is not a

mitigating factor in misdemeanor cases because, had this conduct been present, she would have

been  charged with felony offenses. However, this distinction is important because there have

been misdemeanor cases where defendants did display assaultive and/or aggressive behavior.

Without addressing all of the cases where sentences have been imposed, Counsel would point the

Court to a few examples:  *United States v.Bradley Rukstales*, 21-CR-041 (CJN) (defendant

sentenced 30 days' incarceration after government alleged he threw a chair in the direction of

police officers who had been forced to retreat and was ultimately dragged out of building after

resisting their efforts); *United States v. Jacob Wiedrich*, 21-CR-581 (TFH) (two months' home

detention imposed as defendant was young, did well on pre-trial supervision, and had no criminal

history but shouted at police while entering building); *United States v. Jordan Hernandez*, 21-

CR-272 (TJK) (court imposed two months' home detention despite Hernandez shouting at police

and scaling wall to gain access to Capitol).

 The purposes of sentencing include punishment, rehabilitation, general deterrence,

specific deterrence, and incapacitation.  In this case, there is no need for incapacitation, specific

deterrence or rehabilitation.  Ms. Munn's likelihood of recidivism is very low.  She has expressed genuine remorse and contrition. Her acceptance of responsibility was complete and without reservation.  Thus, the purposes of sentencing that seem most at play are general deterrence and punishment.

General deterrence has also been served in these cases by the collateral consequences that have damaged the lives and reputations of misdemeanants with the same charge in full view of the world. The rise of social media has made available the intimate details of every January 6 defendants' case with the touch of a button. The world is watching and has observed even the least culpable defendants be arrested, charged, and sentenced in public. There is no doubt that general deterrence has been served for those who would be deterred.  Moreover, the public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for the others involved.  Those who would not be deterred by these consequences are likely not capable of being deterred.  A period of probation does constitute punishment as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms.

Ms. Munn committed no violent acts and destroyed no property.  She did not destroy property, steal property, commit violent acts, or encourage others to do so.  Neither she nor her family members engaged in no pre-planning or coordination activities.  She brought no weapons or even defensive gear with her.  Another factor to consider is that Ms. Munn accepted full responsibility for her actions. While it is not appropriate to punish an individual for asserting their right to go to trial and to have the government held to its burden of proof, there is a societal benefit when people who have done wrong acknowledge that wrongdoing in a public way as Ms.

Munn has done.  This has a deterrent effect on future wrongdoing and has a positive effect on others taking responsibility for their actions.

On the issue of sentencing disparity, counsel appreciates that the government has attempted to set out meaningful distinctions in cases and some coherent rationale for the recommendations it makes.  However, those distinctions are not as clear as the government has suggested, and there is no scientific formula that will lead to sentencing uniformity.  In a District with as many judges as this District has, there can be no definitive sentence that addresses the unique facts and circumstances of each case.  Sentences imposed in these cases vary from very short terms of probation to periods of incarceration, and everything in between. While Ms. Munn's conduct was serious, probation remains an appropriate resolution as it is well within the guidelines and would not result in disparity.   *See e.g., U.S. v. Jonathan Sanders*, 1-21-CR-384 (CJN) (36 months' probation); *United States v. Jackson Kostolsky*, 21-cr-197 (DLF) (36 months' probation with home confinement); *U.S. v. Jennifer Parks*, 1:21-CR-363 (CJN) (24 months' probation); *United States v. Julia Sizer*, 1-21-CR-621 (CRC) (12 months' probation); *United States v. Gary Edwards*, 1:21-CR-366 (JEB) (12 months' probation); *U.S. v. Jordan Hernandez*, 21-CR-272 (TJK), (24 months' probation); *United States v. Anna Morgan Lloyd*, 21-cr-164 (RCL) (probation imposed as requested by government); *United States v. Jessica and Joshua Bustle*, 21-Cr-238 (TFH) (probation with home confinement imposed with lesser terms of home confinement than requested by government); *United States v. Andrew Bennett*, Crim. No. 21-227 (JEB) (probation with home confinement imposed); *United States v. Danielle Doyle,* Crim. No. 21-00234 (TNM) (2 months probation with fine imposed); *United States v. Valerie Ehrke*, 21-cr-97 (PLF) (probation imposed as requested by government);  *United States v. Eliel Rosa*, Crim. No. 21-068 (TNM) (12 months probation); *United States v. Jacob Hiles*, Crim. No. 21-155

(ABJ)(2 years probation); *United States v. Sean Cordon*, Crim. No. 21-269 (TNM) (2 months probation); *United States v. John Wilkerson, IV*, Crim. No. 21-302 (CRC)(3 years probation); *United States v. Andrew Wigley*, Crim. No. 21-042 (ABJ)(18 months probation); *United States v. Andrew Hatley*, Crim. No. 21-098 (TFH) (3 years probation); *United States v. Rachael Pert*, Crim. No. 21-139 (TNM)(2 years probation); *United States v. Jeffrey Witcher*, Crim. No. 21-235 (RC)(12 months probation); *United States v. Brandon Nelson and Abram Markofski*, Crim. No. 21-344 (JDB) (2 years probation); *United States v. Thomas Vinson and Lori Vinson*, 21-CR-55 (RBW) (Probation with community service and fine); *United States v. Eliel Rosa*, 21-68 (TNM) (12 months probation with community service); *United States v. Thomas Gallagher*, 21-Cr-41 (24 months probation).  The government may of course point to other cases where periods of incarceration have been imposed. The defense submits that those cases do not justify a sentence of incarceration for Ms. Munn given her family situation, her contrition, her cooperation, and her history and characteristics.

In the end, this Court is faced with the task of meting out a just and appropriate sentence given all of the factors involved, and Ms. Munn places her trust in this Court to do just that.

Respectfully submitted,

A.  J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE PETERSON
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004

.